# In the United States Court of Federal Claims

No. 10-778C
(Filed October 18, 2011)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | Military pay; motion to dismiss, |
| **RICHARD COLLINS, individually and** | * | RCFC 12(b)(1), (b)(6); |
| **on behalf of a class of all those similarly** | * | reduction of separation pay |
| **situated,** | * | under 10 U.S.C. § 1174 (2006); |
| | * | subject matter jurisdiction; |
| Plaintiff, | * | justiciability; extent to which |
| | * | discretionary element of |
| v. | * | otherwise money-mandating |
| | * | statute renders it not money- |
| **THE UNITED STATES,** | * | mandating for discharge due to |
| | * | homosexuality; severability; |
| Defendant. | * | determination of ineligibility on |
| | * | motion to dismiss for failure to |
| * * * * * * * * * * * * * * * * * * * * * * | * | state a claim. |

Joshua A. Block, New York, NY, counsel for plaintiff. Leslie Cooper, ACLU Foundation, New York, NY; and Sara Berger, Freedman Boyd Hollander Goldberg Ives & Duncan, PA; Laura Schauer Ives, ACLU of New Mexico; Matt Garcia and George Bach, Bach & Garcia, LLC, Albuquerque, NM, of counsel.

L. Misha Preheim, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Capt. John Goehring, U.S. Air Force Civil Litigation, Joint Base Andrews, MD, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case is before the court after argument on defendant's motion to dismiss for lack of subject matter jurisdiction or failure to state a claim for which relief can be granted. The key issue for decision is whether a statute entitling active-duty servicemembers involuntarily discharged for homosexuality to separation pay and requiring payment of either 100% or 50% of pay—reserving to regulations the determination of eligibility and exclusion—qualifies as a money-mandating statute when the Secretary of Defense reserves

discretion "in extraordinary cases" to deny separation pay or to increase the award for servicemembers in the 50% category under the regulations up to 100%.

## FACTS

### I. Background

Richard Collins ("plaintiff") enlisted in the United States Air Force (the "Air Force") in April 1997. After serving ably for over nine years, plaintiff was involuntarily—albeit honorably—discharged from service on March 10, 2006, pursuant to 10 U.S.C. § 654 (2006), the Air Force's "Don't Ask, Don't Tell" ("DADT") policy. At the time of his discharge, plaintiff had attained the rank of Staff Sargent (E-5). Plaintiff received $12,851.24 in separation pay, rather than the $25,702.48 that he expected to receive under 10 U.S.C. § 1174 (2006). Plaintiff was informed that the reason his pay had been halved was that his discharge had been for "homosexuality."

### II. Procedural history

Plaintiff filed a class-action complaint in the United States Court of Federal Claims on November 10, 2010, on behalf of himself and all other servicemembers honorably discharged between November 10, 2004, and November 10, 2010, who also received only half separation pay by reason of "homosexuality." Pl.'s Br. filed June 10, 2011, at 9. The complaint alleges that the Department of Defense's ("DoD") policy of halving the separation pay of those servicemembers discharged for "homosexuality" or "homosexual conduct" violated the servicemembers' rights to equal protection and substantive due process. Id.

On February 14, 2011, plaintiff filed a motion to certify the class and a motion to hold in abeyance briefing on class certification because defendant would mount an initial challenge to subject matter jurisdiction. After briefing was completed on March 2, 2011, with defendant indicating its agreement, the court entered an order suspending briefing on the class certification until resolution of defendant's forthcoming motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim, which was filed on May 10, 2011, and fully briefed on July 18, 2011.

**DISCUSSION**

I. Standards

    1. Subject matter jurisdiction pursuant to RCFC 12(b)(1)

Defendant levies the objection that plaintiff's asserted claims are outside the court's jurisdiction. Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998). Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction. Renne v. Geary, 501 U.S. 312, 316 (1991); DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction."). Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (citation omitted); accord M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010). However, when a federal court hears a jurisdictional challenge, "its task is necessarily a limited one." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id.

Defining the jurisdictional reach of the Court of Federal Claims, the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). The Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1).

Fisher is a seminal case in which the United States Court of Appeals for the Federal Circuit sought to clarify Tucker Act jurisprudence, which had blended the questions of the Court of Federal Claims' jurisdictional grant with the merits of the claim. "This mixture has been a source of confusion for litigants and a struggle for courts." Fisher, 402 F.3d at 1172. Because the Tucker Act does not provide any substantive causes of action, "a plaintiff must identify a separate source of substantive law that creates the right to money damages" "in

order to come within the jurisdictional reach and the waiver of the Tucker Act." Id.; see also United States v. Mitchell, 463 U.S. 206, 216 (1983).  In Tucker Act cases, this requirement has often been interpreted to mean that the source must be "money-mandating."  See Fisher, 402 F.3d at 1172.

In Fisher the Federal Circuit condensed the required jurisdictional inquiry into a single-step approach to decide whether a constitutional provision, statute, or regulation is money-mandating and therefore within the jurisdiction of the Court of Federal Claims.

> When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, . . . the trial court at the outset shall determine, either in response to a motion by the Government or *sua sponte*[,] . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating.

> If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course.  For purposes of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

> If the court's conclusion is that the source as alleged and pleaded is not money-mandating, the court shall so declare, and shall dismiss the cause for lack of jurisdiction, a Rule 12(b)(1) dismissal—the absence of a money-mandating source being fatal to the court's jurisdiction under the Tucker Act.

Fisher, 402 F.3d at 1173 (citation omitted).  A statute is money-mandating if "it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'"  Id. (alteration in original) (quoting Mitchell, 463 U.S. at 219); see also Samish Indian Nation v. United States, No. 2010-5067, 2011 WL 4359941, *5 (Fed. Cir. Sept. 20, 2011) (discussing how courts determine whether statute is money-mandating and referencing same rule formulation) ("Samish II").  Regarding what constitutes a "fair interpretation," the Federal Circuit formulated a litmus test:  "It is enough . . . that a statute creating a Tucker Act right be *reasonably amenable* to the reading that it mandates a right of recovery in damages.  While the premise to a Tucker Act claim will not be 'lightly inferred,' . . . a *fair inference* will do."  Fisher, 402 F.3d at 1173-74 (second alteration in

original) (emphasis added) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2003)).

Importantly, the court in Fisher made clear that "[i]t is the statute, not the Government official, that provides for the payment." Fisher, 402 F.3d at 1175.  The court emphasized that

> [t]he fact that the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides. . . .  If the Government official's determinations under the statute are in error, the court is there to correct the matter, and to have the proper determinations made.

Id.  Thus, whether a plaintiff's claims fairly fall within the boundaries of a statute is a determination separate from whether the statute itself is money-mandating, and one that comes after the court has assumed jurisdiction over the matter.  The possibility that a plaintiff actually recovers under a money-mandating statute is a determination made by the court on the merits and is irrelevant for purposes of determining the court's jurisdiction.  See id.

Shortly after Fisher, the Federal Circuit elaborated that the Court of Federal Claims' jurisdiction over claims is not limited only to those claims based on "statutory text [that] leave[] the government no discretion over payment of claimed funds," but also includes claims based on "[c]ertain [statutory] discretionary schemes . . . ."  Samish Indian Nation v. United States, 419 F.3d 1355, 1365 ("Samish I").  More recently, the Federal Circuit explained that the money-mandating requirement "may . . . be satisfied if the Government retains discretion over the disbursement of funds but the statute: (1) provides 'clear standards for paying' money to recipients; (2) states the 'precise amounts' that must be paid; or (3) as interpreted, compels payment on satisfaction of certain conditions."  Samish II, 2011 WL 4359941, at *5 (quoting Perri v. United States, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003)). Should the statute claimed under fall into one of these three categories, the court properly can exercise jurisdiction.

## 2.  Justiciability

Separate from the issue of whether the Court of Federal Claims has jurisdiction to entertain a claim is the question of justiciability.  "Even if a court possesses jurisdiction to hear a claim, when that claim presents a nonjusticiable controversy, the court may nevertheless be prevented from asserting its jurisdiction."  Roth v. United States, 378 F.3d 1371, 1385 (Fed. Cir. 2004).  A claim is justiciable where "the duty asserted can be judicially identified and its breach judicially determined, and . . . protection for the right can be

judicially molded." <u>Baker v. Carr</u>, 369 U.S. 186, 198 (1962).  Thus, "judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct." <u>Murphy v. United States</u>, 993 F.2d 871, 873 (Fed. Cir. 1993) (citing <u>Sargisson v. United States</u>, 913 F.2d 918, 922 (Fed. Cir. 1990)); <u>see also</u> <u>Voge v. United States</u>, 844 F.2d 776, 780 (Fed. Cir. 1988).  A determination of justiciability is also dependent on the court's "ability to supply relief." <u>Adkins v. United States</u>, 68 F.3d 1317, 1322 (Fed. Cir. 1995).

Oft-cited precedent acknowledges that the military is entitled to great deference by the judicial branch when conducting its affairs.  <u>See, e.g.</u>, <u>North Dakota v. United States</u>, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); <u>Orloff v. Willoughby</u>, 345 U.S. 83, 93 (1953) ("[J]udges are not given the task of running the Army."); <u>Murphy</u>, 993 F.2d at 872 ("Justiciability is a particularly apt inquiry when one seeks review of military activities."); <u>Voge</u>, 844 F.2d at 779 ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.").  This does not mean, however, that all such decisions are free from judicial review.  The Supreme Court of the United States has acknowledged that some military decisions may be justiciable matters for the courts.  <u>See</u> <u>Gilligan v. Morgan</u>, 413 U.S. 1, 11-12 (1973) (clarifying that, although no justiciable controversy was present in that case, "we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel . . . .").  The Federal Circuit also has stated explicitly that "[n]ot every claim arising from a military decision presents a nonjusticiable controversy . . . ." <u>Adkins</u>, 68 F.3d at 1323.

When considering military actions, the Federal Circuit has "consistently recognized that, although the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." <u>Adkins</u>, 68 F.3d at 1323 (citations omitted).  As examples of the former, the Federal Circuit has acknowledged that "special deference must be given by a court to the military when adjudicating matters involving their decisions on discipline, morale, composition and the like . . . ." <u>Woodward v. United States</u>, 871 F.2d 1068, 1077 (Fed. Cir. 1989).

Conversely, such deference is not necessarily required when dealing with questions of procedure.  Regulations are given the force of law even though the decision to promulgate them may have been inherently discretionary.  <u>United States v. Nixon</u>, 418 U.S. 683, 695-96 (1974); <u>Service v. Dulles</u>, 354 U.S. 363, 367-68 n.8 (1957); <u>Sargisson</u>, 913 F.2d at 921 ("[O]nce the Secretary promulgated regulations and instructions and made them the basis [for

his decision], his action became subject to judicial review for compliance with those regulations and instructions, even though he was not required to issue them at all."); Voge, 844 F.2d at 779 (explaining that "government officials must follow their own regulations, even if they were not compelled to have them at all . . . ."). Additionally, given that "Congress cannot authorize, nor can [an agency] promulgate, a regulation that violates the Constitution," Preminger v. Sec'y of Veterans Affairs, 517 F.3d 1299, 1306 (Fed. Cir. 2008), the Federal Circuit has noted that, "'even where agency action is [discretionary] . . . review is still available to determine if the Constitution has been violated,'" Holley v. United States, 124 F.3d 1462, 1465-66 (Fed. Cir. 1997) (quoting Padula v. Webster, 822 F.2d 97, 101 (D.C. Cir. 1987)).

### 3. Failure to state a claim

Defendant alternatively moves pursuant to RCFC 12(b)(6) to dismiss plaintiff's complaint for failure to state claims upon which relief can be granted. See RCFC 12(b)(6). "The purpose of [RCFC 12(b)(6)] . . . is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail . . . ." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). The court's task in considering a motion to dismiss for failure to state a claim is to "determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer, 416 U.S. at 236). "A dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief." Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995).

In resolving a RCFC 12(b)(6) motion, the court must assess whether plaintiff's complaint adequately states a claim for relief under the implicated statute and regulations and whether plaintiff has made "allegations plausibly suggesting (not merely consistent with)" entitlement to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (rephrasing Twombly standard as requiring "a claim to relief that is plausible on its face"); accord Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009); McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-57 (Fed. Cir. 2007). Although plaintiff's factual allegations need not be "detailed," they "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the [counterclaims] are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted). Plaintiff "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting Twombly, 550 U.S. at 555 (alteration

in original) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957))). "At the same time, a court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" <u>Acceptance Ins. Cos. v. United States</u>, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting <u>Twombly</u>, 550 U.S. at 555). The court thus "'accept[s] as true all factual allegations in the complaint, and . . . indulge[s] all reasonable inferences in favor of the non-movant'" to evaluate whether plaintiff has stated a claim upon which relief can be granted. <u>Chapman Law Firm</u>, 490 F.3d at 938 (omission in original) (quoting <u>Sommers Oil Co. v. United States</u>, 241 F.3d 1375, 1378 (Fed. Cir. 2001)).

## II.   Whether § 1174 is money-mandating

### 1.   The statutory and regulatory landscape

The instant case concerns the eligibility of an enlisted servicemember to receive separation pay in the event that the servicemember is involuntarily discharged. In 1991, via the National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 501(a)-(d), 104 Stat. 1485, 1549-50 (codified as amended at 10 U.S.C. § 1174 (2006)), Congress extended eligibility to receive separation pay to regular enlisted personnel who had served at least six, but less than twenty, years in the active service of one of the military branches. As such, 10 U.S.C. § 1174(b)(1) provides, as follows:

> A regular enlisted member of an armed force who is discharged involuntarily or as the result of the denial of the reenlistment of the member and who has completed six or more, but less than 20, years of active service immediately before that discharge *is entitled to separation pay computed under subsection (d) unless the Secretary concerned determines that the conditions under which the member is discharged do not warrant payment of such pay.*

10 U.S.C. § 1174(b)(1) (emphasis added). This statutory provision establishes a default that, unless the Secretary of Defense says otherwise, a servicemember who has served at least six years, but less than twenty years, is entitled to separation pay under a statutory formula. The structure of the discretionary grant is unusual. Rather than give the Secretary of Defense discretion to award pay, § 1174(b) creates a default rule of payment. To this court's knowledge, this statutory structure is unique.

Section 1174(b)(2) then provides how much pay an enlisted member can receive under the statute:

> Separation pay of an enlisted member shall be computed under paragraph (1) of subsection (d), except that such pay shall be computed under paragraph (2)

> of such subsection in the case of a member who is discharged under criteria
> prescribed by the Secretary of Defense.

Id. § 1174(b)(2). The statute specifies the two formulas for determining the amount of pay that can be awarded to an involuntarily discharged member:

> The amount of separation pay which may be paid to a member under this
> section is—
>
> > (1) 10 percent of the product of (A) his years of active service, and (B),
> > 12 times the monthly basic pay to which he was entitled at the time of
> > his discharge or release from active duty; or
> >
> > (2) one-half of the amount computed under clause (1).

Id. § 1174(d).  These two provisions appropriately can be labeled "full pay" and "half pay" respectively.  See Department of Defense Instruction No. 1332.29, § 3.3. (1996) (the "DoDI"); Air Force Instruction No. 36-3208, § 9.4. (2004) (the "AFI").  Read in conjunction with § 1174(b)(2), the provisions of subsections (b)(1) and (2) appear to create a default rule that a servicemember who is not deemed ineligible for payment by virtue of the conditions of his discharge is due the full amount of separation pay computed under §1174(d)(1) unless he meets the eligibility requirements set by the Secretary of Defense for half pay.

Although Congress gave the cognizant Secretary the option of deeming the conditions that would render those completely ineligible for separation pay, Congress saw fit to attach several specific conditions to the receipt of payment.  The statute requires that the servicemember "enter into a written agreement with the Secretary concerned to serve in the Ready Reserve of a reserve component for a period of not less than three years following the person's discharge or release," id. § 1174(e)(1)(A), and also that the servicemember not fall into one of four categories of individuals, see id. § 1174(e)(2)(A)-(D), in order to be eligible for payment of separation pay under the statute. 1/

The statute instructs the Secretary of Defense to "prescribe regulations, which shall be uniform for the Army, Navy, Air Force, and Marine Corps, for the administration of [separation pay]."  Id. § 1174(j).  Acting under the authority granted to him by the statute, the Secretary of Defense established the criteria for separation pay in the DoDI.

---

1/  Because none of these four categories of individuals is relevant to the pending matter, the court deems it unnecessary to list the provisions.

According to the DoDI, the initial promulgation occurred in June 1991, and the DoDI was amended in February 1996.  Relevant to this case, the DoDI is broken up into three sections.  The first lists those who are eligible for full separation pay upon their discharge.  See DoDI § 3.1.  In order to receive full payment of non-disability separation pay, the servicemember must be able to satisfy four conditions.  2/  Pertinent to this case, condition 3, DoDI § 3.1.3., provides, as follows:

> The Service member is being involuntarily separated by the Military Service concerned through either the denial of reenlistment or the denial of continuation on AD [Active Duty] or full-time National Guard duty, under one of the following specific conditions:
>
> 3.1.3.1.  *The member is fully qualified for retention, but is denied reenlistment or continuation by the Military Service concerned*.  This includes a Service member who is eligible for promotion as established by the Secretary of the Military Department concerned, but is denied reenlistment or continuation on AD by the Military Service concerned under established promotion or high year of tenure policies.
>
> 3.1.3.2.  The member is fully qualified for retention and is being involuntarily separated under a reduction in force by authority designated by the Secretary of the Military Department concerned . . . .
>
> 3.1.3.3.  The member is a Regular officer, commissioned or warrant, who is being separated under Chapter 36 or Section 564, 1165, or 6383 of reference (d); a Reserve commissioned officer, other than a commissioned warrant officer, separated or transferred to the Retired Reserve under Chapters 361, 363, 573, 861, or 863 of reference (d); or a Reserve commissioned

---

2/  Despite the structure of the statute, as discussed above, the Secretary appears to have either ignored his literal task of designating only those categories of servicemembers ineligible to collect separation pay or coped with the inverse structure of this statute by acting as though it provided him with an affirmative grant of discretion to determine which servicemembers are entitled to pay.  This affirmative-grant regulation adds to the complexity of the statutory-regulatory scheme by discharging the Secretary of Defense's  task through negative implication.  This court, however, must read these regulations as the Secretary's determination that he has decided that those not coming within the categories established in these regulations are those to be excluded under the statutory scheme established by Congress.

officer on the AD list or a Reserve warrant officer who is separated for similar reasons under Service policies.

3.1.3.4. The member, having been denied reenlistment or continuation on AD or full-time National Guard duty by the Military Service concerned under subparagraphs 3.1.3.1. through 3.1.3.3., above, accepts an earlier separation from AD.

Id. § 3.1.3. (emphasis added). As plaintiff notes, the concept of "fully qualified for retention" is not defined anywhere in this regulation, see Pl.'s Br. filed June 10, 2011, at 5, or any other potential source insofar as this court has been made aware. However, given the syntactic structure of section 3.1.3.1., it would appear as though the concept of "fully qualified for retention" is broader than those examples listed in the provision. The phrase "[t]his includes . . . " appears to introduce a non-exhaustive list of conditions that can lead to the involuntary discharge of a servicemember who is otherwise "fully qualified."

The second relevant section of the DoDI lists those members who are eligible for half separation pay. See DoDI § 3.2. Section 3.2. provides:

Half payment of non-disability separation pay . . . is authorized to members of the Regular and Reserve components involuntarily separated from AD who meet each of the following four conditions: (*In extraordinary instances, Secretaries of the Military Departments concerned may award full separation pay to members otherwise eligible for half separation pay when the specific reasons for separation and the overall quality of the member's service have been such that denial of such pay would be clearly unjust*.)

Id. (emphasis added). Of particular note is that this is the first instance of a reservation of something appearing to be *ad hoc* discretion for the appropriate Secretary to intervene in individual cases. This provision seems to indicate that, should the Secretary be apprised of a particular factual situation concerning an involuntarily discharged servicemember, he can elevate that servicemember from half pay to full pay. The explicit use of the word "extraordinary," however, limits the cognizant Secretary's discretion by commanding that this discretion is not to be wielded lightly or frequently. Discretion for this bump in eligibility is present, but the language of the regulation makes this a narrow exception to the general scheme otherwise established.

As is the case with the full-payment section, the pertinent condition for receiving half pay, regarding this case, is condition 3, DoDI § 3.2.3., which provides, as follows:

The Service member is being involuntarily separated by the Military Service concerned through either the denial of reenlistment or the denial of continuation on AD or full-time National Guard duty, *or the Service member is being separated instead of board action as provided in DoD Directive 1332.30 (reference (f)), under one of the following specific conditions:*

      3.2.3.1. *The member is not fully qualified for retention and is denied reenlistment or continuation by the Military Service concerned as provided for in reference (e) or DoD Directive 1332.30 (reference (f)) under any of the following conditions*:

          3.2.3.1.1.  Expiration of service obligation.

          3.2.3.1.2.  Selected changes in service obligation.

          3.2.3.1.3.  Convenience of the Government.

          3.2.3.1.4.  Homosexuality.

          3.2.3.1.5.  Drug abuse rehabilitation failure.

          3.2.3.1.6.  Alcohol abuse rehabilitation failure.

          3.2.3.1.7.  Security.

      3.2.3.2.  The member is being separated under a Service-specific program established as a half-payment level by the Secretary of the Military Department concerned, as provided for in section 4., below.

      3.2.3.3.  The member, having been denied reenlistment or continuation on AD or full-time National Guard duty by the Military Service concerned under subparagraphs 3.2.3.1. and 3.2.3.2., above, accepts an earlier separation from AD.

DoDI § 3.2.3. (second emphasis added).

      This structure is odd.  Rather than parallel the general structure of 3.1.3.1., as might be expected, the language of section 3.2.3.1. specifically uses the conjunction "and," thereby imposing two required conditions that must be satisfied to render a discharged servicemember eligible for half separation pay.  The literal language of the regulation

requires that the discharged servicemember be both not fully qualified for retention—whatever that may entail—and that the servicemember have been denied reenlistment or continuation under one of the stated conditions. Neither plaintiff nor defendant has yet addressed this apparent ambiguity in the regulatory structure or the potential implications of whether this express list of conditions can shed light on the definition of "fully qualified for retention."

The third relevant section sets out specific "Limitations on Eligibility for Separation Pay" and states that "[s]ervice members separated under the following circumstances are not eligible for separation pay . . . ." Id. § 3.4. Of particular note to the pending case, section 3.4.12. permits "[d]etermination in extraordinary cases by the Secretary concerned that the conditions under which the member is separated do not warrant separation payment. It is intended that this discretionary authority to deny payment be used sparingly. This authority is not to be delegated." Id. § 3.4.12. This reservation of discretion is similar to the reservation found in section 3.2. Section 3.4.12. allows the cognizant Secretary, in extraordinary cases, to completely disqualify a servicemember from receiving any separation pay. Thus, per the DoDI, the Secretary of the relevant military branch has discretion to both bump a discharged servicemember from half pay to full pay and to demote from payment eligibility to complete ineligibility. Whereas the discretion to increase payment is only qualified by "extraordinary circumstances," this latter discretion to disallow payment comes with even stricter limitations on its use: explicit guidance that this situation is not to be the rule, but a truly rare exception. While the exercise of this individualized discretion is authorized, the language of the regulation adheres to the general command of the statute that otherwise eligible servicemembers are "entitled to separation pay," 10 U.S.C. § 1174 (b)(1), and provides that the Secretary should exercise great caution in departing from this default by denying pay entirely.

The DoDI instructs the Secretaries of the individual branches of our military to establish regulations that implemented the DoD regulations and that "are consistent with the policies in this Instruction." DoDI § 4.3.2. The Secretary of the Air Force complied and issued the AFI. Of note is that the AFI adopts a different structure than the DoDI. Rather than split the full pay and half pay groups into two entirely self-contained categories, as the DoDI did in DoDI §§ 3.1.-3.2., the AFI provides three categories: generally applicable requirements for receiving separation pay regardless of the reason for the servicemember's involuntary discharge are set out in AFI § 9.1.; the types of discharges qualifying for full

payment of separation pay are set out in AFI § 9.2.; and the types of discharges qualifying for half payment of separation pay are set out in AFI § 9.3.  3/

Under the AFI an airman must meet the requirements set forth separately in section 9.1. to be eligible for any payment of separation pay.  If the airman does meet those requirements, he is eligible for payment.  Given that the language of the statute signifies that servicemember is entitled to payment "unless the Secretary concerned determines [otherwise]," 10 U.S.C. § 1174(b)(1), clearing the hurdles set forth in AFI § 9.1. appears to indicate that the discharged airman is entitled to some pay.  Thus, one must proceed to the second step—not present under the DoDI model, which performs all evaluations under one step— to determine how much the airman is to receive.  Here, the AFI presents two mutually exclusive categories.  Section 9.2. of the AFI provides, as follows:

> 9.2. **Full Separation Pay (Nondisability)**.  Members involuntarily separated from AD may be entitled to full separation pay . . . if they meet the criteria in **paragraph 9.1.** and the following conditions:
>
>> 9.2.1.  The member's characterization of service is "honorable" and the member fully qualified for retention, but is being involuntarily separated by denial of reenlistment or continuation on AD under one of the following specific conditions:
>>
>>> 9.2.1.1.  Member is denied reenlistment under an Early Release/Date of Separation rollback program.
>>>
>>> 9.2.1.2.  Member is denied reenlistment under High Year of Tenure (HYT) policy.  This applies only to the E-4 HYT program since members have 20 years or more of service in all other HYT programs.
>>>
>>> 9.2.1.3.  Member is being involuntarily separated under a reduction in force program.

AFI § 9.2.  This section departs from the DoDI parent provision.  DoDI 3.1.3.1. establishes "fully qualified for retention" as an independent ground for eligibility for full separation pay; this AFI provision does not.  Rather, this corresponding AFI provision renders "fully

---

3/  In an effort to enhance readability, this court will not quote all of the requirements set forth in AFI § 9.1. because it has not been disputed that plaintiff meets its requirements.

qualified for retention"—still undefined—as a necessary, but not sufficient, condition for payment. In addition, the airmen must fall into one of the three subsequent categories established by the AFI. Interestingly, the Air Force appears to have interpreted DoDI § 3.1.3.1. as a complete list. Rather than read "[t]his includes" as a supplementation, the Air Force appears to have interpreted this provision as "this includes [only]." Thus, an obvious tension already is manifested between the DoDI and the AFI provision.

Regarding the circumstances of those airmen only eligible to receive half separation pay, AFI § 9.3. provides, as follows:

> 9.3. **Half Separation Pay (Nondisability).** Members involuntarily separated from AD may be entitled to half separation pay . . . if they meet the criteria in **paragraph 9.1** and the following conditions:
>
> > 9.3.1. The member's characterization of service is "honorable" or "under honorable conditions (general)" and the member is being involuntarily separated through either the denial of reenlistment or denial of continuation on AD under one of the following specific conditions:
> >
> > > 9.3.1.1. **Expiration of Service Obligation** . . . .
> > >
> > > . . . .
> > >
> > > 9.3.1.2. **Involuntary Convenience of the Government Separation** . . . .
> > >
> > > 9.3.1.3. **Drug Abuse Treatment Failure** . . . .
> > >
> > > 9.3.1.4. **Alcohol Abuse Treatment Failure** . . . .
> > >
> > > 9.3.1.5. **Homosexual Conduct** . . . .
> > >
> > > 9.3.1.6. **Discharge in Interest of National Security** . . . .

Id. § 9.3. Again, this language does not track the language of the corresponding DoDI provision, section 3.2.3.1. Unlike the DoDI provision, this AFI provision completely eliminates the reference to "not fully qualified for retention," instead jumping to the reasons for the involuntary discharge. The Air Force was not following closely the language of the DoDI. Rather than give force to the conjunction "and" in DoDI § 3.2.3.1., the Air Force

read the "and" as "because," thereby reading section 3.2.3.1. as "[t]he member is not fully qualified [because the member] is denied reenlistment . . . under any of the following conditions." DoDI § 3.2.3.1. Finally, this court notes that this list of conditions is not the same. Pertinent to this case, DoDI lists "homosexuality," DoDI § 3.2.3.1.4., whereas the AFI lists "homosexual conduct," AFI § 9.3.1.5. The two are not synonymous.

Lastly, corresponding to the discretionary-denial section of the DoDI, the AFI adds a section explicitly devoted to discretion vested in the Secretary of the Air Force. See AFI § 9.6. It is read in full, as follows:

**9.6.  Secretary of the Air Force (SAF) Determination:**

> 9.6.1.   A member may be separated under an Air Force specific program established as a one-half or no payment level by SAF.

> 9.6.2. Notwithstanding the provisions of this or any other directive, the SAF may direct, in extraordinary cases, because of the conditions under which a member is separated, that the member does not warrant separation pay. Use this discretionary authority sparingly and do not delegate it.

>> 9.6.2.1.  Requests for SAF to deny separation pay to an otherwise qualified member will originate with the unit commander. The request will be in memorandum format and contain justification for denial of separation pay.

>> 9.6.2.2.  Unit commanders requesting SAF action under this paragraph must notify the member of the request and justification for the request. The member will be given 3 workdays to submit a rebuttal with the assistance of military legal counsel.

Id.

While this provision embraces the discretionary ability to deny a discharged servicemember any separation pay, it does not appear that the AFI included a provision similar to the one found at DoDI § 3.2. that granted the Secretary of each military department the power to elevate a discharged servicemember's pay from half pay to full pay.

2.  Case law precedents

Plaintiff observes that the Court of Federal Claims on numerous instances has implicitly assumed that it has jurisdiction to hear cases arising under 10 U.S.C. § 1174. See Pl.'s Br. filed June 10, 2011, at 12-13.  4/  Of particular note in the cases listed by plaintiff is Watson v. United States. 49 Fed. Cl. 728 (2001).  The allegation in Watson was the same as in the pending dispute—a discharged servicemember was seeking to challenge the constitutionality of the practice of halving separation pay for those servicemembers discharged for homosexuality.  See id. at 729.  The court in Watson implicitly assumed jurisdiction to hear the matter and denied the Government's motion to dismiss on the ground of issue preclusion, finding that a prior suit challenging the servicemember's discharge pursuant to DADT lacked identity of issues, was not actually litigated, was not necessary to the prior judgement, nor did the plaintiff have a full and fair opportunity to litigate the separation pay issue.  See id. at 731-33.  Despite the fact that the plaintiff in Watson made allegations identical to those made here, the Government defendant did not seek to challenge the court's jurisdiction in that case, which ultimately settled.  Now, ten years later, after assumed jurisdiction has been exercised in the interim, defendant seeks a holding on point.

In this case defendant has responded that "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." Arizona Christian Sch. Tuition Org. v. Winn, 131 S. Ct. 1436, 1448 (2011).  The direction of the United States Supreme Court controls.  However, plaintiff has pointed to at least two cases of the Court of Federal Claims that have ruled expressly that 10 U.S.C. § 1174 is a money-mandating statute.  See Toon v. United States, 96 Fed. Cl. 288, 300 (2010); Siemietkowski v. United States, 86 Fed. Cl. 193, 197 (2009).  Following the Federal Circuit's direction in Fisher and Metz v. United States, 466 F.3d 991 (Fed. Cir. 2006), the court in Siemietkowski looked to § 1174 with the view that, "as long as the plaintiff has made a claim under a money-mandating statute or regulation under which he or she may be eligible for compensation, the plaintiff has stated a money-mandating claim sufficient to survive a motion to dismiss . . . ." Siemietkowski, 86 Fed. Cl. at 197.  The court then decided that, "[b]ecause section 1174 authorizes separation pay in specified cases, the statute is money-mandating and the court has jurisdiction over the case."  Id.  The court in Toon likewise noted that "separation pay upon release from active duty is encompassed in

---

4/  Plaintiff listed the following cases:  Martinez v. United States, 77 Fed. Cl. 318 (2007); Loeh v. United States, 74 Fed. Cl. 106 (2006); Elliott v. United States, 61 Fed. Cl. 185 (2004); Eisenhuth v. United States, 59 Fed. Cl. 460 (2004); McMullen v. United States, 50 Fed. Cl. 718 (2001); Watson v. United States, 49 Fed Cl. 728 (2001); Hanes v. United States, 44 Fed. Cl. 441 (1999).

10 U.S.C. § 1174 (2006). . . . which authorizes separation pay in specified cases, [and therefore] is a money-mandating statute." Toon, 96 Fed. Cl. at 300 (citation omitted).

Defendant is correct that these decisions stand as persuasive authority. See Def.'s Br. filed July 18, 2011, at 3. This court acknowledges that the court in Siemietkowski and later in Toon did not discuss in depth the issue of discretion that defendant now argues. Nonetheless, defendant's further attempts to distinguish these two cases as "not involv[ing] a situation where the service member alleged that he or she received half separation pay, but should have received full separation pay," id., manifests a misreading of the Federal Circuit's decisions in Fisher and its progeny. The exact nature of a plaintiff's claim is irrelevant to determining subject matter jurisdiction because, at the jurisdictional stage, the court examines only whether a successful plaintiff under the statute is entitled to money damages. See Fisher, 402 F.3d at 1175-76; see also Metz, 466 F.3d at 997-98; Doe v. United States, 463 F.3d 1314, 1324 (Fed. Cir. 2006). The court concluded in Fisher that the consequence of a plaintiff's claim not falling within the ambit of the money-mandating statute—a merits decision that occurs after the court has taken jurisdiction—is "simply . . . [that] plaintiff loses on the merits for failing to state a claim . . . ." Fisher, 402 F.3d at 1175-76. 5/ Or, as succinctly stated by plaintiff at oral argument, "A statute is either money mandating for everyone or no one." Transcript of Proceedings, Collins v. United States, No. 10-778C, at 24 (Fed. Cl. Sept. 22, 2011) ("Tr."). The court does not consider the nature of plaintiff's complaint at the jurisdictional stage.

It does not appear that any case has addressed directly the argument pressed by defendant—namely, that the discretion that the statute reserves to the Secretaries of the armed service branches makes this statute entirely a discretionary scheme and, thus, not money-mandating. Consequently, the relevant precedents offered by the parties provide the framework for resolving this jurisdictional question.

The court begins first, as the parties do, with the language of the statute and accompanying regulations. Section 1174(b)(1) provides that enlisted members with at least six but less than twenty years of service who are involuntarily discharged are "entitled" to separation pay "unless the Secretary concerned determines that the conditions under which

---

5/ The most graphic illustration of this concept is found in Britell v. United States, 372 F.3d 1370 (Fed. Cir. 2004). The plaintiff in Britell brought suit seeking reimbursement for an abortion from the Civilian Health and Medical Program of the Uniformed Services. Even though both the statute and accompanying regulations specifically stated that the cost of abortions was not covered, the court ruled that there was jurisdiction to hear the case because the statute was a money-mandating source of law. See id. at 1378-79.

the member is discharged do not warrant payment of such pay." 10 U.S.C. § 1174(b)(1). Several decisions from the Federal Circuit have analyzed the use of the word "entitled" in a statute and its effect on whether the statute is money-mandating.  In Agwiak v. United States, 347 F.3d 1375 (Fed. Cir. 2003), the Federal Circuit faced the issue whether 5 U.S.C. § 5942(a), a statute providing for remote-duty pay, was a money-mandating statute.  The statute, in relevant part, provided that "an employee of an Executive  department . . . who is assigned to duty . . . at a site so remote from the nearest established communities or suitable places of residence as to require an appreciable degree of expense, hardship, and inconvenience . . . is entitled, in addition to pay otherwise due him, to an allowance of not to exceed $10 per day."  5 U.S.C. § 5942(a) (2000).  The Federal Circuit held that this statute was money-mandating.  Agwiak, 347 F.3d at 1380.  The court focused on the words "is entitled" and deemed this statute similar to another statute that had been held to be money-mandating—the Military Pay Act—that similarly provided that "[t]he following persons *are entitled* to the basic pay of the pay grade to which assigned or distributed." Agwiak, 347 F.3d at 1380; see also Metz, 466 F.3d at 998 (acknowledging that Military Pay Act previously has been held to be money-mandating "because § 204 provides that a member of a uniformed service who is on active duty is 'entitled to the basic pay of the pay grade to which assigned'" (quoting 37 U.S.C. § 204)).

The court in Agwiak also focused on the use of the word "shall" in determining that § 5942(a) was money-mandating.  Agwiak, 347 F.3d at 1380.  The court noted that "[t]he statute further provides that [t]he allowance *shall be paid* under regulations prescribed by the President.  We have repeatedly recognized that the use of the word 'shall' generally makes a statute money mandating."  Agwiak, 347 F.3d at 1380 (second alteration in original) (citations omitted) (internal quotation marks omitted).  In this case § 1174 also employs the word "shall" in several contexts.  See, e.g., 10 U.S.C. § 1174(b)(2) ("Separation pay of an enlisted member shall be computed under paragraph (1) of subsection (d) . . . .").

Defendant contends that the use of "is entitled" and the use of the word "shall" in this statute are accompanied by the conditional grant of authority to the Secretary to award separation pay in the first instance.  6/  It is true that this statutory scheme, while using words

_____

6/  Although this court does recognize the element of discretion given to the Secretary, the court does take issue with defendant's characterization of that discretion. Defendant repeatedly refers to this grant as the discretion "to award separation pay."  See Def.'s Br. filed July 18, 2011, at 4.  This is not the discretion conferred on the Secretary. Instead, the statute only allows the Secretary discretion not to award pay to which the statute provides an enlisted member otherwise is entitled.  More than merely a semantic difference, this discretion only to take away a servicemember's separation pay makes this statute unique

that the Federal Circuit has indicated signal the money-mandating characteristic of a statute, does contain an element of discretion to be exercised by the cognizant Secretary, whereas the remote-duty pay statute and the Military Pay Act do not.  It thus becomes necessary to explore the precedents dealing with statutes examining whether or not the statutory schemes containing elements of discretion are still money-mandating.

This court examines these precedential cases with the eye that the regulations under § 1174 reserve to the cognizant Secretary the discretion in extraordinary circumstances to "bump up" to full pay a servicemember who, under the DoDI regulations is eligible only for half pay, <u>see</u> DoDI § 3.2., or the discretion to disallow payment of either half or full separation pay to a servicemember otherwise qualified under the regulations, <u>see</u> DoDI § 3.4.12.  The court focuses primarily on the DoDI because both parties have agreed that, to the extent that the Air Force's regulations set forth in the AFI conflict with the DoD regulations in the DoDI, the DoD regulations will control.  <u>See</u> Tr. at 7.

The fact that the statute generally allowed the Secretary of Defense discretion to set the eligibility criteria for full and half separation pay to certain classes of discharged servicemembers does not provide the discretion under examination.  That discretion already has been exercised in the form of the DoDI and is no longer available to the Secretary.  To that extent, the regulations are money-mandating because, absent the reservation of discretion in "extraordinary" circumstances, a servicemember who qualifies for pay under those regulations would be entitled to pay under the statute as not otherwise disqualified by the Secretary.  Or, in the words of <u>Fisher</u>, the regulations, absent the reservation of discretion, are money-mandating because "when the requirements of the [regulations] are met . . . the member is entitled to compensation."  <u>Fisher</u>, 402 F.3d at 1174-75.

In seeking guidance, this court begins first with <u>Adair v. United States</u>, 648 F.2d 1318 (Ct. Cl. 1981).  The United States Court of Claims in <u>Adair</u> confronted a group of claims by Public Health Service ("PHS") physicians who were seeking "variable incentive pay" ("VIP") under 37 U.S.C. § 313 (1976).  <u>Id.</u> at 1319.  The statute, in relevant part, provided that certain medical officers, "under regulations prescribed by the Secretary of Defense or by the Secretary of Health, Education, and Welfare ["HEW"] . . . and approved by the President . . . may, upon acceptance of the written agreement by the Secretary

---

<u>6/</u>  (Cont'd from page 19.)

and this jurisdictional issue not straightforward.  This is not a situation where Congress directed the Secretary of Defense: "you decide who is to be paid"—even though this is how the regulations were structured.

concerned . . . be paid an amount not to exceed $13,500 for each year of the active duty agreement." 37 U.S.C. § 313. Pursuant to this statute, the Secretary of HEW had issued regulations that had rendered the group of PHS physicians ineligible for VIP, and they filed suit under the Tucker Act seeking award of VIP. The Court of Claims, based on its reading of <u>United States v. Testan</u>, 424 U.S. 392 (1976), held that this statute was not money-mandating. <u>Adair</u>, 648 F.2d at 1324.

The court read as "implicit in the holding of <u>Testan</u> that a statute providing solely for discretionary payment of money does not give rise to a right to recover money damages from the United States." <u>Adair</u>, 648 F.2d at 1322 (citation omitted) (internal quotation marks omitted). The court reasoned that Congress had passed this statute so that the Secretaries of DOD and HEW "could offer pecuniary bonuses in recruiting physicians for various government positions" and quoted from legislative history that "this [discretionary] authority would be used in varying amounts by the Defense Department (or PHS) as the need dictates and would be used only where necessary to meet shortages of critically needed health personnel." <u>Id.</u> at 1322-23 (citations omitted) (internal quotation marks omitted). Thus, although eligibility requirements were present in the statute, so too was an "overriding discretionary requirement that a written active duty agreement be accepted by the Secretary" to meet each Secretary's needs. <u>Id.</u> at 1323. Moreover, the court pointed out that, even if the Secretary allowed a physician VIP, the Secretary could pick any amount below $13,500.00 that he determined would provide a sufficient hiring incentive in a particular case. <u>Id.</u>

In <u>Bradley v. United States</u>, 870 F.2d 1578 (Fed. Cir. 1989), the Federal Circuit confronted whether the prevailing pay-rate statute, 5 U.S.C. § 5349 (1982), was a money-mandating statute when journeymen plate printers from the Bureau of Engraving and Printing (the "BEP") sought to have the Government institute a new wage rate and back pay, <u>id.</u> at 1579. The statute at issue provided that the "pay of [BEP] employees . . . shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and . . . as the pay-fixing authority of [the BEP] may determine." 5 U.S.C. § 5349. The Department of the Treasury personnel manual provided that the wages for BEP printers would be based on a job-to-job comparison with the American Bank Note Company ("ABNC"). <u>Id.</u> at 1579. In April 1985 a study was completed that showed that BEP printers were making less than private employees at ABNC, but the Director of the BEP would not revise the BEP pay structure, which prompted the employees to sue. <u>Id.</u> at 1579-80. The Federal Circuit ruled that the statute conferred jurisdiction to hear the case. <u>Id.</u> at 1580.

The court in <u>Bradley</u> acknowledged that "'[p]revailing rates' wage legislation like § 5349 . . . with its express reference to adjustment 'from time to time as nearly as is

consistent with the public interest' . . . bestows a 'broad congressional grant of administrative discretion.'" Id. at 1580 (quoting Adams v. United States, 810 F.2d 1142, 1143-44 (Fed. Cir. 1987) (citations omitted)).  However, the court, citing prior case law, found that prevailing pay-rate statutes did contain some limits on the discretion of the agencies.  As such, the court concluded that, "[i]nasmuch as discretion is not unlimited, the statute must be deemed to be a pay-mandating statute."  Id.  Ultimately, although the court declined to rule for the plaintiffs that the Government had acted unreasonably in undertaking another study before adjusting pay rates, the court construed the limitation on the administrators' discretion to be the requirement that the rates had to be adjusted at some point; essentially, the merits issue in litigation under the statute would be only whether or not the Government delayed unreasonably in doing so.  See id. at 1581-82.

Several years later, in Huston v. United States, 956 F.2d 259 (Fed Cir. 1992), the Federal Circuit affirmed a holding that a statute was not money-mandating and thus was beyond the jurisdiction of the court to hear.  Id. at 262.  In Huston an employee with the Army Corps of Engineers sought to have the court order a pay adjustment pursuant to a claim under 5 U.S.C. § 5333(b) (1988).  Id. at 260.  The statute at issue provided, "[u]nder regulations prescribed by the Office of Personnel Management, an employee in a position to which this subchapter applies . . . may be paid at one of the rates for his grade which is above the highest rate of basic pay being paid to any such prevailing-rate employee regularly supervised, or at the maximum rate for his grade, as provided by the regulations." 5 U.S.C. § 5333(b).  The Federal Circuit concluded that this statute was not money-mandating.  Id.

The court explained that "an employee meeting certain requirements *may* have his pay increased; conversely, the statute does not in any way *require* the government to increase an employee's pay."  Id. at 261.  The court rejected the plaintiff's argument that the Corps's discretion was constrained by the accompanying regulations, which "set out the findings an agency must make before it increases pay."  Id. at 261-62.  The court then distinguished the holding in Bradley by noting that the constriction on discretion present in Bradley—the statute's command that "'pay . . . shall be fixed and adjusted'"—was absent in this case. 5 U.S.C. § 5349.  Instead, the regulations that the plaintiff "cite[d] do not curtail discretion; they merely explain the requirements an employee must satisfy to be eligible for a pay increase which might or might not be forthcoming."  Id.  Comparing the situation to the one present in Adair with "'six eligibility requirements plus an overriding discretionary requirement,'" id. (quoting Adair, 648 F.2d at 1323), the court determined that "even if an individual meets section 5333(b)'s eligibility requirements, the agency may or may not grant a pay increase."  Id.  Therefore, the court concluded that the statute was not money-mandating.  Id.

Several years following <u>Huston</u>, the Federal Circuit determined that a discretionary statute was money-mandating for purposes of jurisdiction. <u>See</u> <u>Doe v. United States</u>, 100 F.3d 1576 (Fed. Cir. 1996) ("<u>Doe I</u>"). An informant who had provided Customs officials information leading to the seizure of illegal drugs asserted in <u>Doe I</u> an entitlement to a monetary award under the "moiety statute." <u>Id.</u> at 1578. As amended in 1986, 19 U.S.C. § 1619 (1994), provided:

> If-[a]ny person who is not an employee or officer of the United States . . . (B) furnishes to a United States attorney, the Secretary of the Treasury, or any Customs Officer original information concerning . . . (ii) any violation of the customs laws . . . which is being, or has been, perpetrated or contemplated by any other person; and (2) such . . . information leads to a recovery of . . . (B) any fine, penalty, or forfeiture of property incurred; the *Secretary may award and pay such person an amount that does not exceed 25 percent of the net amount so recovered*.

19 U.S.C. § 1619(a) (emphasis added).

The Federal Circuit in <u>Doe I</u> rejected the Government's arguments that this statute gave the Secretary unlimited discretion to determine whether to give an award and held that this statute was money-mandating. <u>See</u> <u>id.</u> at 1580-82. Although the court recognized similarities to the statute in <u>Adair</u>, the court noted that it did "not write on a clean slate, or come to this provision in the law in the abstract." <u>Id.</u> at 1581. Precedent of the court had interpreted a previous version of the statute to require the payment of some money, and "Congress provided no indication in either the statutory language or legislative history that it intended to reject or alter this construction and to render awards wholly discretionary." <u>Id.</u> Referring to the legislative history accompanying the 1986 amendment, the court found: "Congress did not indicate any intention to give the Secretary absolute discretion to deny an award under the moiety statute when the conditions for award are met. Rather, it is clear that Congress intended only to give the Secretary 'some discretion' in making awards of less than 25 percent . . . ." <u>Id.</u> at 1582.

Based on this canon of statutory construction, the court concluded that § 1619 was money-mandating because it "continues to require the payment of some award to claimants who have met the statutory conditions for recovery . . . ." <u>Id.</u> The court expressly stated that "[t]he fact that the Secretary retains some discretion to determine the amount of an award, within prescribed limits, does not preclude the statute from being money mandating." <u>Id.</u> The court drew a sharp distinction between those statutes that are "*wholly* discretionary" and those that have some bounds on the Secretary's discretion. <u>Id.</u>

23

In <u>Perri v. United States</u>, 340 F.3d 1337 (Fed. Cir. 2003), the Federal Circuit found a discretionary scheme fell short of the money-mandating standard required for jurisdiction under the Tucker Act, <u>id.</u> at 1339.  A former confidential informant for the Federal Bureau of Investigation filed suit in <u>Perri</u> to recover 25% of the amount the Government obtained upon seizure of property from a criminal defendant against whom the informant helped build the case.  <u>Id.</u>  The plaintiff alleged that he was entitled to the money under 28 U.S.C. § 524(c)(1)(B) (2000), which created the Department of Justice Assets Forfeiture Fund and authorized the Attorney General to make payments from the fund.  <u>Id.</u> at 1339, 1341. Section 524 at the time provided:

> (c)(1) There is established in the United States Treasury a special fund to be known as the Department of Justice Assets Forfeiture Fund . . . which shall be available to the Attorney General without fiscal year limitation for the following law enforcement purposes-
>
> . . . .
>
> (B) the payment of awards for information or assistance directly relating to violations of the criminal drug laws of the United States . . .
>
> (C) at the discretion of the Attorney General, the payment of awards for information or assistance leading to a civil or criminal forfeiture involving any Federal agency participating in the Fund;
>
> . . . .
>
> (2) Any award paid from the Fund for information, as provided in paragraph (1)(B) or (C), shall be paid at the discretion of the Attorney General or his delegate, under existing departmental delegation policies for the payment of awards . . . . Any award for information pursuant to paragraph (1)(B) shall not exceed $250,000.  Any award for information pursuant to paragraph (1)(C) shall not exceed the lesser of $250,000 or one-fourth of the amount realized by the United States from the property forfeited.

28 U.S.C. § 524.

The court construed this statute as a "money-authorizing statute, not a money-mandating [statute]."  <u>Perri</u>, 340 F.3d at 1341.  Speculating as to why the plaintiff chose to

bring the action under subsection (B) rather than the apparently more appropriate subsection (C), the court stated: "Since that subsection explicitly provides that awards relating to forfeiture are to be paid 'at the discretion of the Attorney General,' it would be difficult, if not impossible, to argue that that subsection is a money-mandating provision." Id. at 1342 (quoting 28 U.S.C. § 524(c)(1)(C)). Of course, the court noted that even the plaintiff's chosen litigation avenue did not completely remove this problem, given that subsection (c)(2) provided the explicit reference to the Attorney General's discretion over disbursement of the funds. Id. The court concluded that this particular statute was not money-mandating because "[i]t provides no standards for determining 'payment of awards for information or assistance' . . . . Moreover, it does not specify the amount to be paid or the basis for determining such amount." Id. (quoting 28 U.S.C. § 524(c)(1)(B)).

Carefully distinguishing the case from Doe I, the Perri court deemed the moiety statute to be "quite different" from the one at issue. Id. at 1343. According to the court, 19 U.S.C. § 1619 had all the requirements of a money-mandating statute that § 524 lacked:

> The moiety statute provides clear standards for paying an award: the furnishing of information about fraud upon or violation of customs laws that led to recovery of duties withheld or of a fine penalty or forfeiture. It stated the precise amount to be paid: originally 25 percent of the amount recovered, but not more than $50,000. [And] [a]s interpreted by the Court of Claims, it required the Secretary to make payment to anyone who met those conditions. The only question Doe decided was that the subsequent statutory amendment modifying the amount to be paid from a flat 25 percent to "not [to] exceed 25 percent" did not change the money mandating character of the moiety statute.

Id. (citations omitted) (final alteration in original). The Perri court was impressed that "[t]he detailed standards in the moiety statute are a far cry from the general language in subsection (B)," and the reason why § 1619 was money-mandating but § 524 was not. Id.

Shortly after Fisher the Federal Circuit issued Samish I. 419 F.3d 1355. The Samish Indian Nation brought suit against the United States seeking federal benefits allegedly owed under, inter alia, the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450 (2000). Id. at 1358. The court first acknowledged that statutes that leave the Government no discretion over whether to pay out funds as well as "[c]ertain discretionary schemes . . . support claims within the Court of Federal Claims jurisdiction." Id. at 1364. Importantly, the court then interpreted Perri as establishing a three-part test for whether a statute granting administrative discretion would be money-mandating. Id. at 1364-65. Money-mandating statutes include those statutes "(1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3)

[that] as interpreted, compel payment on satisfaction of certain conditions." Id. (quoting Perri, 340 F.3d at 1342-43). The court then explained why the ISDA failed this three-part test. After discussing the complexities of funding through self-determination contracts, the court ultimately concluded that "[a]bsent a contract this statutory language and structure is not reasonably read as demonstrating congressional intent to establish a damage remedy under the ISDA for non-payment of the underlying benefits, based on the wrongful refusal to accord the Samish federal recognition . . . ." Id. at 1366.

Doe v. United States, 463 F.3d 1314 (Fed. Cir. 2006) ("Doe II"), followed one year later. Plaintiffs in Doe II were a class of Department of Justice attorneys who filed suit alleging violations of the overtime provisions of the Federal Employees Pay Act of 1945 ("FEPA"). Id. at 1315. They claimed that they were owed administratively uncontrollable overtime ("AUO") pay pursuant to 5 U.S.C. § 5545(c)(2) (2000). Id. That statute provided, in relevant part:

> The head of an agency, with the approval of the Office of Personnel Management, *may* provide that-
>
> . . . [*sic*]
>
> (2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, *shall* receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty . . . .

5 U.S.C. § 5545(c)(2). Pursuant to this statute, the Office of Personnel Management had promulgated regulations to implement this statute. Under the regulation

> [t]he head of each agency, or an official who has been delegated authority to act for the head of an agency in the matter concerned, is responsible for . . . . [d]etermining in accordance with section 5545(c) of Title 5, United States Code, and this subpart, which employees shall receive premium pay on an annual basis . . . .

5 C.F.R. § 550.161(b) (2006). Pursuant to this regulation, the Department of Justice published Order 1551.4A setting forth a general policy of providing AUO pay to persons

26

meeting the statutory requirements.  Doe II, 463 F.3d at 1317.  Paragraph 7 of the order provided that "[p]remium pay under this order may be paid to eligible employees assigned to the classes of positions listed in Appendix 1 to this order."  Id. (quoting U.S. DEP'T OF JUSTICE, ORDER DOJ 1551.4A, ADMINISTRATIVELY UNCONTROLLABLE OVERTIME PAY (1975)).

The Federal Circuit held that this statute and regulatory scheme are money-mandating.  Id. at 1324.  The court began by noting that "[a] statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group."  Id. at 1324.  The court also remarked that "[t]here is a presumption that the use of the word 'may' in a statute creates discretion."  Id. (citing McBryde v. United States, 299 F.3d 1357, 1362 (Fed. Cir. 2002)).  However, the court then went on to explain that "this presumption of discretion may be rebutted by 'the intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand.'"  Id. (citing McBryde, 299 F.3d at 1362).  The court summarized the law, stating: "We have found that a statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following . . . ," then listing the Perri factors as laid out in Samish I.  Id.  Applying this standard, the court concluded that § 5545(c)(2) was money-mandating.  The court reasoned, as follows:

> By using the word "may," the statute gives the "head of an agency" the discretion to allow AUO pay for employees in particular positions, although this discretion is somewhat limited because the agency may only award AUO pay to employees in positions that meet the requirements listed in section 5545(c)(2).  Further, once the agency makes a determination that a particular position is entitled to AUO pay, the employee "shall" receive premium pay under the statute.  Thus, the statute is money-mandating because once a condition is met, namely that the head of an agency states that a position meets the criteria listed in subsection (c)(2), the statute requires payment to employees with that position.

Id. at 1325 (citations omitted).

Most recently, the Federal Circuit decided Samish II, 2011 WL 4359941.  The Federal Circuit again wrestled with claims of entitlement to funds by the Samish Indian Nation, this time under the Tribal Priority Allocation ("TPA") system.  Id. at *1.  When first addressing the problem, the Federal Circuit slightly qualified the test laid out in Samish I, and stated that

[i]n limited situations, the "money-mandating" requirement may also be satisfied if the Government retains discretion over the disbursement of funds but the statute: (1) provides "clear standards for paying" money to recipients; (2) states the "precise amounts" that must be paid; or (3) as interpreted, compels payment on satisfaction of certain conditions.

Id. at *5 (quoting Perri, 340 F.3d at 1342-43). The court then determined that the TPA system, although securing funds for tribes, was not itself a statute or regulation. Id. Therefore, the relevant statutes for this case were "the annual Appropriations Acts that provide the TPA system with funds and the statutes creating the programs supported by TPA funds." Id. However, upon examination of the Appropriations Acts, the Federal Circuit concluded that the Acts "do not provide a clear standard for paying money to recognized tribes, state the amounts to be paid to any tribe, or compel payment on satisfaction of certain conditions." Id. Instead, the Appropriations Acts merely provided agencies—such as the Bureau of Indian Affairs—with specific sums for funding to use for all programs it oversees. Id. at *6.

3. Jurisdictional analysis

Having reviewed the applicable relevant precedent, this court concludes that 10 U.S.C. § 1174 is a money-mandating statute, thereby bringing plaintiff's case within the subject matter jurisdiction of the Court of Federal Claims. The court's review revealed that the cases relied on by defendant—primarily Adair, Huston, and Perri—are distinguishable from the situation at bar, primarily in that neither § 1174 nor the accompanying DoD regulations grant to the cognizant Secretary absolute, unfettered discretion to deny an award of separation pay. 7/ Given that this element of complete discretion is lacking, the situation presented, although unique, most closely resembles that in Doe II, and when the three-factor test originally articulated in Perri is applied, this statutory program comes within the ambit of a money-mandating statute.

_____

7/ This jurisdictional determination is made by acknowledging that the limitations on discretion or, in the words of the Perri test, the "clear standards for paying," Perri, 340 F.3d at 1342-43, can be found in both the statute and in any accompanying regulations. See Brodowy v. United States, 482 F.3d 1370, 1375 (Fed. Cir. 2007) (providing support for this method by noting that "the Court of Federal Claims has jurisdiction over money claims founded not only on statutes, but also on 'any regulation of an executive department'" (quoting 28 U.S.C. § 1491)). In this case, the court relies on the combined scheme established by reading both § 1174 and the DoDI together, rather than one or the other.

Beginning first with Adair, defendant argues—appropriately—that the court held that a statute placing sole discretion to make a payment in an administering official was not money-mandating because it did not give rise to a right to recover from the Government. See Def.'s Br. filed July 18, 2011, at 6-7.  Although this court concurs with defendant's reading, this case is distinguishable on its facts.  The statute in Adair gave the Secretaries discretion to award pay up to a certain amount to physicians meeting certain requirements. 648 F.2d at 1320.  Relevant to the case at bar was how the Court of Claims construed that award of discretion.  Looking to the legislative history of the statute, the Court of Claims explained that this was a tool for the Secretaries to use to recruit qualified doctors to government service in areas of "critical[] need[]."  Id. at 1322-23.  Therefore, the Secretaries, assessing their particular hiring needs at any one time, would be able to extend to some candidates of their choosing something extra as an incentive in order to hire them. Not only was the determination of whether a particular candidate would need this incentive discretionary, but so was the amount of the potential enticement, restricted only by a particular upward limit.  No two awards of money under the statute need to be the same and, indeed, "Congress envisioned that physicians working side-by-side and performing essentially the same duties, would not necessarily receive the same salary[;] one might be eligible for [the discretionary payment] while the other was not."  Id. at 1323.  Hence, the bestowing of complete discretion on whether to award payment, and if so, how much to pay was left to the discretion of the Secretaries so that they could meet their individualized hiring needs.

The scheme in the Adair statute is not at all similar to the type of statute at issue. Looking to the legislative history behind § 1174, as the Court of Claims did in Adair, 8/ this court is presented with an entirely different congressional motivation.  While a case-by-case determination was appropriate under the statute in Adair, Congress did not contemplate that the Secretary of Defense would make case-by-case determinations in awarding separation

---

8/  Although this court is reluctant to explore legislative history absent a cannon of statutory construction that allows it, the review of precedent has indicated that it is a source that the Court of Claims and later the Federal Circuit have considered in making the money-mandating determination.  See, e.g., Adair, 648 F.2d at 1323 n.15; Doe I, 100 F.3d at 1581; see also Doe II, 463 F.3d at 1324 (noting that a "presumption of discretion may be rebutted by the intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand" (citation omitted) (internal quotation marks omitted)). Therefore, it is appropriate to consider the relevant legislative history behind § 1174.  See generally Univ. of Cal. v. Pub. Emp't Relations Bd., 485 U.S. 589, 595-96 (1988) (examining statute's legislative history in determining how broadly to construe exception provided by statute).

pay. Rather than to be used as an incentive, Congress passed the separation pay statute as a conciliatory measure. "[S]eparation pay is designed to compensate career oriented service members who have been denied a career opportunity because of circumstances beyond their control." H.R. Rep. No. 101-665, at 135 (1990), reprinted in 1990 U.S.C.C.A.N. 2931, 2995. Prior to the amendments to the statute, separation pay was only available for officers. Anticipating that substantial reductions in force would be occurring, see Def.'s Br. filed May 10, 2011, at 2-3, § 1174(b) sought to correct "this inequity" in "transition assistance benefits" by allowing career-oriented enlisted personnel who subsequently were involuntarily discharged to collect separation pay, as well, H.R. Rep. No. 101-665, at 135.

This background does not correspond at all to the legislative grant of discretion present in the Adair statute. The structure of § 1174 makes clear that the award of pay was to be the rule, even though the Secretary was granted limited discretion to disqualify some whose involuntary discharge would perhaps indicate wrongdoing rather than an unintentional deprivation of a career opportunity. This could explain the unique structure of the statute providing that all enlisted personnel with between six and twenty years of service are "entitled" to separation pay, unless disqualified by the Secretary—a default rule of payment to the involuntarily discharged servicemembers, rather than a tool to be used by the Secretary to award or persuade certain individuals. Hence, one of the bases in finding sole discretion in Adair is absent in this case.

Next, defendant analogizes the present situation with that in Huston. See Def.'s Br. filed July 18, 2011, at 7. The statute in Huston provided that "under regulations prescribed by the [agency] . . . an employee in a position to which this subchapter applies . . . may be paid . . . ." 5 U.S.C. § 5333(b). The regulations in that case laid out eligibility requirements for receiving pay, but did not provide that, in the event a person met the eligibility requirement, that person would necessarily receive pay. See id. at 261. However, what this analogy does, in effect, is to ignore the rule of Bradley—the case that the Huston court carefully distinguished. In Bradley the court stated, "Inasmuch as discretion is not unlimited, the statute must be deemed to be a pay-mandating statute." Bradley, 870 F.2d at 1580. The Huston court found that the limitation on discretion in Bradley was that the statute provided that "pay . . . shall be fixed and adjusted," 5 U.S.C. § 5333(b), a statutory command that was lacking in Huston, id.

Contrary to defendant's arguments, that statutory command is present in § 1174 as it was in Bradley. The text of § 1174(b)(1) states that the concerned servicemember "*is entitled to separation pay computed under subsection (d)* unless the Secretary concerned determines that the conditions under which the member is discharged do not warrant payment of such pay." 10 U.S.C. § 1174(b)(1) (emphasis added). Therefore, the case at bar is more similar to Bradley than Huston because, once a servicemember meets the "eligibility

30

requirements" under the regulations, he is entitled to payment under the statute. Meeting the eligibility requirements under the regulations thus does not merely render the servicemember eligible for separation pay. The courts in both Bradley and Huston found this statutory directive to be sufficient "limitation" on the administrator's discretion to render a statute money-mandating.

This leads to the ultimate jurisdictional hurdle in this case—the reservation of discretion in the DoDI regulations to the cognizant Secretary in extraordinary circumstances either to bump a servicemember from half pay to full pay or to deny separation pay. Defendant has argued that this reservation of discretion is unlimited and that no boundaries fetter the cognizant Secretary's ability to deny a particular servicemember separation pay. See Def.'s Br. filed July 18, 2011, at 7-8. Were it not for the discretion that the Secretary of Defense reserved for the appropriate military branch Secretary, no dispute would be present that this statutory and regulatory scheme was money-mandating. The statute itself provides that a servicemember is entitled to pay unless the Secretary determines that he is ineligible, and, further, the statute provides that a servicemember is to receive full pay unless the Secretary indicates that he should receive half. The statute then requires the Secretary to promulgate uniform regulations for all the military branches, which he did in the form of saying who was "authorized" for full pay and half pay—the effect of this "authorization" obviously being that the servicemember was entitled to payment as per the statute. The issue then is twofold: does the reservation of discretion to intervene in extraordinary individual cases render the statute wholly discretionary and thus non-money-mandating, and, if so, is this legal interpretation of § 1174 permissible under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)?

This court concludes that this reservation of discretion does not change the nature of this statute and that, even with the reservations of discretion to the cognizant Secretary in DoDI §§ 3.2. and 3.4.12. to be used in extraordinary circumstances, § 1174(b)(1) still is money-mandating. 9/  A final reservation of discretion in the appropriate Secretary to be

_____

9/ Chevron formulated a rule to be applied by a court when "review[ing] an agency's construction of the statute which it administers." Chevron, 467 U.S. at 842. If "Congress has directly spoken to the precise question at issue" such that its intent is clear, the court and the agency "must given effect to th[at] unambiguously expressed intent . . . ." Id. at 842-43. See generally Fathauer v. United States, 566 F.3d 1352, 1356-57 (Fed. Cir. 2009) (finding statute unambiguous and Chevron analysis unnecessary because "'[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete.'" (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461-62 (2002))). If Congress has not addressed the issue and "the statute is silent or ambiguous with respect to the specific issue," the court is tasked with

used only in extraordinary circumstances is either unreasonable or inconsistent with a general mandate to the Secretary to pay those the statute intended to benefit—*i.e.,* those involuntarily denied a career—and to establish those conditions of discharge that render a servicemember ineligible.   However, this reservation of discretion, to be used in extraordinary circumstances, does not render the entire statutory or regulatory scheme "wholly discretionary."   In fact, even with this reservation of discretion, this statutory and regulatory scheme still passes the three-part test laid out first in Perri and applied in its progeny.

Thus, while defendant has enthusiastically seized upon the language in Perri that a statute can be "money authorizing . . . [but] not . . . money-mandating," Perri, 340 F.3d at 1341, the case at bar can be distinguished by applying the test developed by the Federal Circuit in deciding Perri.  The court in Perri determined that the statute under scrutiny was not money-mandating because it (1) did not provide clear standards for paying an award, (2) did not state the precise amount to be paid, or (3) had not been interpreted as compelling payment to someone meeting certain conditions.  See Perri, 340 F.3d at 1342-43.  The statutory and regulatory scheme at bar meets not just one, but all three, of those conditions.

First, § 1174 and DoDI §§ 3.1.-3.2. do provide "clear standards" for paying an award. Section 1174 itself provides qualifications that entitle a servicemember to separation pay, provided the Secretary has not decided he falls into an ineligible group.  For example,

_____

9/ (Cont'd from page 31.)

determining "whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.

The court's conclusion makes a Chevron analysis unnecessary.  However, the court will opine that, had it been determined that the reservation of discretion in the DoDI had changed the nature of the statute, serious Chevron questions would have been raised.  The statute sets a default that a servicemember who meets certain statutory requirements receives full separation pay.  Likewise, the statute, while conferring discretion on the Secretary to rule some servicemembers ineligible, only does so, it appears, to the extent that the Secretary must provide for the exercise of this discretion through generally applicable regulations to all services, not merely on an *ad hoc* basis for every single servicemember who is dismissed involuntarily.  Given that it appears unassailable that the statute would be money-mandating without these two clauses reserving discretion in the Secretary, it is unlikely that an interpretation of these two elements of discretion as overriding or displacing the money-mandating aspect would be upheld as reasonable legal interpretations of the statute.

32

Congress established that the servicemember must have at least six, but less than twenty, years of service, 10 U.S.C. § 1174(b)(1), but be involuntarily discharged, id., and must be willing to sign a written commitment to serve in the Ready Reserve, id. § 1174(e)(1)(A). Then, fulfilling his statutory duty to prescribe the conditions of discharge that rendered a servicemember ineligible for separation pay, the Secretary of Defense created four conditions that a servicemember must meet in order to be "authorized" to receive payment. See DoDI §§ 3.1.-3.2. These provisions establish clear standards for payment of an award.

Second, § 1174 states exactly three amounts that can be paid under the statute. Pursuant to congressional instruction, an involuntarily discharged servicemember can collect either full pay under § 1174(d)(1), half-pay under § 1174(d)(2), or no pay. The Secretary does not have discretion to award a particular servicemember or servicemember group one-third pay, three-quarters pay, or any other amount. That decision was not given to him. Unlike the statutory schemes in Adair or Doe I or even Perri, all of which only set an upward limit on what the administrator could pay out, but authorized any payment less than that, this statute provides just three options. Thus, unlike a situation under Adair or Perri where the plaintiffs can make no plausible assertion that they were entitled to a specific sum of money, § 1174 allows servicemembers, such as plaintiff, to come into court and specifically—and credibly—assert that entitlement to a particular sum of money based on the statutory language. Moreover, the statutory scheme announces a preference for full pay given that § 1174(b)(2) provides that "[s]eparation pay of an enlisted member shall be computed under paragraph (1) of subsection (d)," unless the individual is eligible only for half pay under criteria prescribed by the Secretary expressly establishing a baseline default of full pay unless the eligibility requirements for half-pay are met. 28 U.S.C. § 1174(b)(2). Therefore, this court concludes that § 1174 does provide the precise amounts to be paid.

Finally, § 1174 and the accompanying regulations do compel payment to servicemembers who meet certain conditions. This is the prong on which defendant relies to argue that the statute places no restrictions on the Secretary of Defense's authority to withhold payment from otherwise qualified servicemembers. See Def.'s Br. filed July 18, 2011, at 8-9. In other words, defendant argues that the administration of separation pay is "wholly discretionary" and that the Secretary's discretion is unlimited. However, by the plain language of the statute, and even the plain language of the regulations reserving discretion, situations are specified in which payment is compelled. First, discretion is not unlimited. The Secretary cannot deny separation pay to all involuntarily discharged servicemembers. Had he attempted to do so, his judicial and congressional rebuke would have been all but assured. Thus, it is impossible to argue that the Secretary's discretion, even under § 1174(b)(1), was unlimited. Second, and even stranger, defendant made no mention of the language in the discretionary regulations on which it so heavily relies. Both DoDI §§ 3.2. and 3.4.12. explicitly say that the reservation of discretion may only be used

in extraordinary circumstances.  Therefore, the language reserving discretion to the Secretary is qualified.  In order to invoke the discretionary authority granted by these two provisions, the facts surrounding the discharge must be extraordinary.  In fact, DoDI § 3.4.12. explicitly states that "this discretionary authority to deny payment [should] be used sparingly."  10/ DoDI § 3.4.12.  This language limits the exercise of the discretion: payment is compelled in all ordinary involuntary discharges where the servicemember otherwise meets all applicable requirements.  If a servicemember is able to meet the payment authorization requirements under DoDI §§ 3.1. or 3.2., and the circumstances surrounding his discharge were "ordinary," payment is compelled.

Lastly, this court is uncomfortable with the notion that a secretary of an executive agency can defeat an otherwise money-mandating statute merely by reserving last-ditch discretion.  The Federal Circuit has recognized that some discretionary statutory schemes can still be money-mandating even if the administrator retains a measure of discretion for payment of funds.  The ability to change the nature of a statute by issuing regulations that provide a veto would completely upend this area of law.  Or, as summarized by the Federal Circuit in Fisher, "[s]uch a perverse understanding of Congress's purpose cannot be the law . . . [for] [i]t is the statute, not the Government official, that provides for the payment." Fisher, 402 F.3d at 1175.  The Secretary of Defense cannot alter a statutory right to payment simply by reserving the ability ultimately to pass on all awards made under the statute.

Therefore, this court concludes that 10 U.S.C. § 1174(b) is money-mandating. Consequently, this court has jurisdiction to hear and decide plaintiff's claim under the Tucker Act.

III.  Whether this case is nonjusticiable

Defendant argues that this court should decline to hear this case even if it does find that it has jurisdiction under the Tucker Act because this case presents a nonjusticiable controversy.  See Def.'s Br. filed May 10, 2011, at 11.  Defendant's argument is essentially

_____

10/ Interestingly, although also using the word "extraordinary," DoDI § 3.2. does not further caution that the cognizant Secretary's discretion be used sparingly.  Thus, the implication is that the cognizant Secretary has more discretion to elevate servicemembers from half pay to full pay than he does to deny payment altogether.  However, given that both half pay and full pay are payment, this discretion does nothing to assault the logic that § 1174 and its accompanying regulations are money-mandating—in other words, it does nothing to detract from the argument that otherwise qualifying servicemembers are entitled to payment under the statute and regulation.

three-fold.  First, defendant contends that this case is "simply another of the 'thousands of [] routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with.'" Def.'s Br. filed July 18, 2011, at 10 (quoting Murphy, 993 F.2d at 873 (alteration in original) (citation omitted)).  In defendant's view the fact that plaintiff's challenge is a constitutional one does not mandate the outcome that the court hear this case.  See id.  Second, defendant argues that this case is nonjusticiable because the Secretary of Defense retained ultimate discretion over the payment of separation pay, thereby depriving the court of the "tests and standards" against which the court is required to weigh the Secretary's actions.  Def.'s Br. filed May 10, 2011, at 11.  Third, defendant combines the justiciability analysis with the analysis of dismissal for failure to state a claim, arguing that because the court is unable to supply relief, this case should be deemed nonjusticiable.  None of these contentions pass muster.

Defendant is correct that merely stating a constitutional claim does not itself make the claim justiciable and entitle plaintiff to review.  As cited by defendant, the Supreme Court dismissed a constitutional claim as nonjusticiable in Gilligan v. Morgan, 413 U.S. 1, 11 (1973).  However, defendant's first argument fails to draw the necessary distinction between that case and this one.  In Gilligan the Supreme Court refused to hear the constitutional challenge because the challenge—brought by the students at Kent State University—went to the "training, weaponry and orders" of the National Guard—topics that the Supreme Court found to be squarely vested in the political branches of government. Id. at 5, 10.  This holding is in line with other precedents mandating deference to internal military matters and personnel decisions.  See, e.g., North Dakota, 495 U.S. at 443 ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); Orloff, 345 U.S. at 93 ("[J]udges are not given the task of running the Army.").  Indeed, the Federal Circuit has long acknowledged that "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province . . . ." Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983).

That, however, is not the situation presented.  Because plaintiff is not challenging his discharge under DADT, no issue is before the court concerning why plaintiff was discharged from service in the Air Force.  Thus, those concerns about military composition that have led in the past to deference by courts are not implicated.  The composition of the Air Force is not at issue because plaintiff has been discharged from the Air Force.  This case raises only issues arising subsequent to that discharge and pursuant to regulations promulgated by the Secretary of Defense as to the amount of separation pay to which plaintiff is entitled.  Military "decisions as to the composition, training, equipping, and control of a military force," Gilligan, 413 U.S. at 10, are not raised by plaintiff's complaint.

35

Instead, plaintiff's case concerns "society's legal obligations to those who are no longer within the military forces." Fisher, 402 F.3d at 1182.

Defendant's second argument is no more persuasive. It is undeniable that 10 U.S.C. § 1174 affords the Secretary some discretion. However, precedent dictates that the mere presence of discretion does not render a matter nonjusticiable. For example, in Sargisson, the court stated that, although the "statute does not place any procedural or substantive limitations on the Secretary's discretion[,] . . . once the Secretary promulgated regulations and instructions and made them the basis for [the challenged decision,] his action became subject to judicial review for compliance with those regulations and instructions . . . ." Sargisson, 913 F.2d at 921. The Secretary of Defense in the case at bar has acted and promulgated regulations. Thus, according to the Federal Circuit in Adkins, "[i]n cases in which procedural violations are alleged, the test or standards against which [the] court measures the military's conduct are inherent: they are the applicable statutes and regulations." Adkins, 68 F.3d at 1323; see also Fisher, 402 F.3d at 1177 (stating that "we have consistently noted that a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue" (citation omitted)).

Additionally, it is obvious that "Congress cannot authorize, nor can the [Secretary] promulgate, a regulation that violates the Constitution." Preminger, 517 F.3d at 1306. Plaintiff has cited decisions in which the Federal Circuit found it appropriate to examine the constitutionality of military regulations because of a constitutional challenge. See Berkley v. United States, 287 F.3d 1076, 1090-91 (Fed. Cir. 2002); Holley, 124 F.3d at 1465-66. This court takes particular notice of the Federal Circuit's decision in Berkley in which the Federal Circuit addressed a claim filed by a class of Air Force officers alleging that the Reduction-in-Force Board violated their Fifth Amendment right to equal protection by taking into account racial and gender characteristics. Id. at 1081. At issue in that case was the Memorandum of Instruction governing selection of those officers to be involuntarily discharged due to a reduction in force. Id. The instructions established different standards of treatment of officers based on their race and gender. Id. The Government argued that the claim was nonjusticiable because it involved matters of military composition. Id. at 1090-91. The Federal Circuit was unpersuaded. While recognizing that the military was owed deference "for matters involving 'discipline, morale, composition and the like,'" id. at 1091 (quoting Woodward, 871 F.2d at 1077), the Federal Circuit went on to conclude that "[s]uch deference . . . does not prevent or preclude our review of the Instruction in this case in light of constitutional equal protection claims raised," id.

Lastly, defendant tries to fit either its RCFC 12(b)(6) argument—or potentially its merits argument—under the rubric of justiciability. See Def.'s Br. filed July 18, 2011, at 11. Defendant is correct that one consideration a court must account for when determining

justiciability is the "ability to supply relief." Murphy, 993 F.2d at 872. However, the concept of "ability" is broader than defendant suggests. It cannot be that a court should find a claim nonjusticiable because a party loses, for this is a determination that can only be made after the court has assumed jurisdiction and either examined the pleadings for a RCFC 12(b)(6) motion or reached the merits, both of which necessarily follow a ruling that the case is justiciable. For a court to lack ability to provide relief under the concept of justiciability, the plaintiff must be seeking something that is beyond the court's power to effect because of separation of powers concerns and the vesting of unreviewable discretion in another body. See, e.g., Orloff, 345 U.S. at 93 (finding that it was "not within the power" of the courts to review determination to assign doctor to particular duties in the medical field); Wilson v. Walker, 777 F.2d 427, 429 (8th Cir. 1985) (recognizing that "[t]raditional notions of judicial restraint and of the separation of powers require" courts to refuse to review military duty assignments).

Having decided that this particular case falls within this court's jurisdiction under the Tucker Act, does concern the constitutionality of promulgated regulations, and does not invade that area of the military's discretion in making personnel decisions, this court does have the "ability" to provide relief in this case. As in Fisher plaintiff is asking only that he be awarded the monies that he alleges unconstitutionally were withheld from him. See Fisher, 402 F.3d at 1171. Should the court decide that this allegation has merit, this court does have the power pursuant to the waiver of sovereign immunity under the Tucker Act to order the Government to pay the money wrongfully withheld. Therefore, this case is not one of those situations in which the court should stay its hand for a lack of power to render a remedy.

IV.  Whether the complaint fails to state a claim

Having ruled that jurisdiction is present, the court proceeds to evaluate defendant's motion to dismiss plaintiff's complaint for failure to state a claim. Several of the cases discussed above similarly moved on to this step and found that, even though the statute was money-mandating, the plaintiffs in the respective cases had failed to state claims for relief because their situations were not encompassed by the statutory or regulatory schemes. See Doe II, 463 F.3d at 1325; Metz, 466 F.3d at 999-1000; Britell, 372 F.3d at 1379, 1384. As explained in Fisher,

[a]ssuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the initial determination that plaintiff's cause rests on a money-mandating source, the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is

simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted.

Fisher, 402 F.3d at 1175-76.  Because the factual and legal situation requires further proceedings to adjudicate plaintiff's complaint, this court declines to grant defendant's 12(b)(6) motion.

A complaint will survive a motion to dismiss for failure to state a claim if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft, 129 S. Ct. at 1949 (citation omitted) (internal quotation marks omitted).  Therefore, after disposing of any conclusory or formulaic components of the complaint, this court must determine whether the remaining factual obligations "plausibly suggest an entitlement to relief," id. at 1951.  This determination requires a finding that "the complaint . . . allege[s] facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting Twombly, 550 U.S. at 557).  The court must "draw on its judicial experience and common sense" when determining whether or not plaintiff's entitlement to relief is plausible. Iqbal, 129 S. Ct. 1950.

Both parties devoted considerable briefing to defendant's motion to dismiss on the merits.  However, one issue that can be summarized succinctly eliminates much of the contention between the parties.  Plaintiff is not asking for an order striking the entire regulatory scheme as unconstitutional; rather, as this court understands the arguments, plaintiff seeks only to have that part of the regulation relating to homosexuality excised as violative of the Equal Protection clause. See Pl.'s Br. filed June 10, 2011, at 27-30.  Nor can the complaint be construed as asking the court to rewrite the regulations—an endeavor that this court cannot and will not do.  The issue is constrained entirely to whether, should this court strike those provisions in the DoDI and/or the AFI relating to homosexuality and homosexual conduct as the basis for awarding half pay because they violate the Equal Protection clause, the remaining regulations would allow plaintiff to recover full pay. See Gentry v. United States, 546 F.2d 343, 347 (Ct. Cl. 1976) ("Obviously, for plaintiff's claim to succeed, the remaining provisions must be able to stand, giving rise to plaintiff's entitlement to benefits.").

Defendant has argued that, even if the alleged unconstitutional provisions of the AFI and DoDI are severed, plaintiff still will not be eligible for full pay under the regulatory scheme. See Def.'s Br. filed May 10, 2011, at 14-17; Def.'s Br. filed July 18, 2011, at 15-19.  Defendant relies on the structure of both the DoDI and the AFI in assigning discharged personnel into categories of either full pay or half pay, arguing that, even if references to "homosexuality," DoDI § 3.2.3.1.4., and "homosexual conduct," AFI § 9.3.1.5., are

removed, the facts surrounding plaintiff's discharge still would not place him within the "specific conditions" listed as necessary to receive full pay. This court cannot conclude that this result is certain under the regulatory scheme.

Based on the plain reading of the AFI, this court agrees that plaintiff does not qualify for full pay under section 9.2. As noted above, section 9.2. requires that, to be entitled to full separation pay, a discharged airman must meet the requirements of section 9.1. and one of the following "specific conditions" set forth in AFI § 9.2.1. Plaintiff cannot meet one of the specific conditions listed in the subsections to section 9.2.1. However, under the facts as pleaded, plaintiff can meet the general eligibility requirements listed in AFI § 9.1. This indicates to the court that plaintiff is eligible for some pay under the AFI. Thus, if the allegedly unconstitutional provisions of section 9.3. are severed from the regulations, plaintiff can no longer meet the "specific conditions" necessary to qualify for half pay. Defendant appears to be arguing that, because plaintiff would then fall into one of the regulatory cracks left by the manner of the regulations' drafting, plaintiff—although meeting the general eligibility requirements for separation pay—would be out of luck and not actually entitled to any pay under the AFI.

This reading of the Air Force's regulations, while syntactically correct, gives the court pause. Given the odd structure adopted by the AFI—which is not consistent with the structure of the DoDI—the AFI seems to produce a regulatory gap in which some discharged airmen are deemed eligible for payment but, as a consequence of poor drafting, simply receive no separation pay. This gap does not appear consistent with the structure of the DoDI, which makes the determinations of eligibility for full or half pay in one step under DoDI § 3.1. or § 3.2., respectively. Further, it does not appear that this regulatory gap is possible under the DoDI given the structure of the DoD regulations. This raises serious concerns as to whether the AFI is consistent with the DoDI. Although defendant has argued that no conflict between the AFI and DoDI is present, see Def.'s Br. filed July 18, 2011, at 16-18, this issue has not been resolved. In the event that there is a conflict, both parties have agreed that the DoDI would control. See Tr. at 7. Therefore, in order for plaintiff's complaint to be facially insufficient to make relief implausible, it must be the case that plaintiff would not be able to recover full pay under the DoDI.

Based on the language of DoDI § 3.1.3., defendant has not persuaded the court at this stage that plaintiff would be absolutely barred from recovery of full separation pay, which would be required to grant defendant's motion to dismiss for failure to state a claim. Relevantly, DoDI § 3.1.3.1. provides that, if "[t]he member is fully qualified for retention, but is denied reenlistment or continuation by the Military Service concerned," he satisfies condition three of eligibility for full pay. DoDI § 3.1.3. The issue that emerges is that "fully qualified for retention" is not defined in the regulations. DoDI § 3.1.3.1. further provides

that "[t]his includes a Service member who is eligible for promotion as established by the Secretary of the Military Department concerned, but is denied reenlistment or continuation . . . under established promotion or high year of tenure policies." Id. § 3.1.3.1. Defendant has interpreted this language as giving meaning to the phrase "fully qualified for retention." See Def.'s Br. filed July 18, 2011, at 16-19.

This court cannot conclude that this interpretation is correct as a matter of law because the plain language of the regulation lends little support to defendant's reading. The regulation says only that "fully qualified for retention," yet still discharged, "includes" those discharged under promotion or HYT policies. The limiting language for which defendant argues is not readily apparent. The regulation does not say "this includes only . . ." or "this is limited to . . . ." It might be that plaintiff is correct and that "fully qualified for retention" should be interpreted based on the list of conditions in 3.2.3.1. If that is the case, and this court strikes DoDI § 3.2.3.1.4., "Homosexuality," from that list, then plaintiff might fall under the phrase "fully qualified for retention" and be entitled to full pay. However, plaintiff has not demonstrated that his reading of the regulation is correct as a matter of law. DoDI § 3.2.3.1. states condition 3 for half pay, as follows: "[t]he member is not fully qualified *and* is denied reenlistment or continuation by the Military Service concerned . . . under any of the following conditions . . . ." DoDI § 3.2.3.1. If the determination of "fully qualified" is actually a separate determination from the listed reasons for which a servicemember may be discharged, the listed conditions do not inform "fully qualified for retention."

Given the interpretative challenges embedded in this regulatory scheme, defendant has not shown that the complaint fails to state a claim for which plaintiff is entitled to relief. Based on the well-pleaded allegations, plaintiff could prevail under the regulatory structure, which requires further exploration and analysis that are inappropriate for this stage of the proceedings.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion to dismiss is denied.

2. The stay granted by the order entered on March 3, 2011, is lifted, and the parties shall submit by October 31, 2011, a joint proposed schedule for any discovery and briefing on plaintiff's motion to certify the class.

/s/ Christine O.C. Miller

_____

**Christine Odell Cook Miller**
Judge